## No. 14-1580

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE HENRY M. JACKSON FOUNDATION
FOR THE ADVANCEMENT OF MILITARY MEDICINE, INC.,

Plaintiff-Appellant,

v.

NORWELL, INC.,

Defendant-Appellee.

Appeal from the U.S. District Court for the District of Maryland (Titus, J.) In Case
No. 8:14-cv-01067-RWT

## BRIEF OF APPELLEE NORWELL, INC.

Marc S. Hines
Hines Carder
3090 Bristol Street
Suite 300
Costa Mesa, CA 92626
Phone: (714) 513-1122
Fax:  (714) 242-9529
Email: mhines@hinescarder.com

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1580          Caption: Henry M. Jackson Foundation v. Norwell, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Norwell, Inc.
(name of party/amicus)
who is          Appellee          , makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?
YES [ ]     NO [X]

2. Does party/amicus have any parent corporations?        YES [ ]     NO [X]
If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?        YES [ ]     NO [X]
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 6.1(b))?
YES [ ]     NO [X]

If yes, identify entity and nature of interest:

5. Is party a trade association?
YES [ ] NO [X]
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding?
YES [ ] NO [X]
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Marc S. Hines                Date: 9/8/14
Counsel for:  Norwell, Inc.

## CERTIFICATE OF SERVICE
**************************

I certify that on  September 8, 2014  the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

 /s/ Marc S. Hines            September 8, 2014
(Signature)                         (Date)

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………….   iv

JURISDICTIONAL STATEMENT…………………………………..……1

INTRODUCTION……………………………………………………………….2

STATEMENT OF ISSUES……………………………………………………...3

STATEMENT OF THE CASE……………………………………………….....4

    a.  The Dispute That Gave Rise to the Arbitration. ………………………..4

        i.   The GP2 License Agreements and Sponsored Research of the GP2

             Clinical Trial……………………………………………………6

        ii.  Foundation's Wrongful Termination and Breach of the Agreement..12

    b.  The Arbitration. ………………………………………………………15

    c.  Selection of the Panel……………………………………………...……..16

    d.  The Award…………………………………………………….…..…..16

    e.  The District Court Proceeding……………………………………….16

SUMMARY OF ARGUMENT……………………………….……………17

ARGUMENT…………………………………………………………….23

    I.     The District Court's Treatment of Foundation's Motion to Vacate...23

    II.    Standard of Review..……………………………………..………...25

    III.   The Panel did not Disregard Law or the Language of the 2009

          Agreement by Finding the May 7, 2009, Email Incorporated into the

2009 Agreement……………………………………………………..27

IV.    Peoples' Apparent Authority to Bind the Foundation is Clear……...32

V.    The May 7, 2009, Email Exchange Post-dates the 2009 Agreement

and, Thus, is Not Excluded by the Integration Clause………………38

VI.    The Panel did not Award Consequential Damages…….……………39

    a.  The Panel Found that Norwell's Loss of Funding Was a

    "Proximate and Direct" Result of Foundation's Misconduct;

    Accordingly, They Are Direct and Recoverable………………....39

    b.  Foundation's Argument that ETF Funding Derived From a

    Collateral Source is Irrelevant; Foundation Had an Obligation to

    Provide Norwell with Data in Order for It to Seek Funding From

    Any Source…………………………………………………………39

VII.    The Panel Found that Norwell's Loss of Funding Was Proximately

Caused by Foundation; Accordingly the Causation Requirement Has

Been Met…………………………………………………….....48

VIII.    The Panel's Award Adheres to Fundamental Principles of Maryland

Damages Law, is Fair, Proportionate, and Supports Continuation of a

Promising Clinical Trial for A Breast Cancer Vaccine……………50

    a.  The Standard for Manifest Disregard of the Law is Extremely

    High……………………………………………………………50

b. The Panel did not Disregard Law by Awarding Norwell Damages and Specific Performance as Remedies for Breach of Contract..52

i. Under Maryland law, an Award of Specific Performance and Damages is Not Prohibited…………………………..………52

ii. The Panel Did Not Impose New Contractual Requirements That Fail to Draw their Essence from the Agreements…...55

IX.    A Mutual, Final, and Definite Award was Rendered………………57

X.    ATTORNEYS' FEES AND COSTS………………………....………62

XI.    CONCLUSION………………………………………………..………64

REQUEST FOR ORAL ARGUMENT………………………………..……..65

CERTIFICATE OF COMPLIANCE…………………………………………66

CERTIFICATE OF SERVICE………………………………………………..67

[iii]

## TABLE OF AUTHORITIES

### Cases

*Adams v. Wilson*, 264 Md. 1, 12 (1971) ..................................................27

*Archway Motors, Inc. v. Herman*, 37 Md. App. 674, 681 (1977) ..........................53

*Archway Motors, Inc.*, 37 Md. App. at 681 .................................................53

*Bernardini v. Stefanowicz,* 29 Md. App. 508 (Md. 1976) .....................................54

Consolidation Coal Co. v. United Mine Workers of America, 196 L.R.R.M. (BNA) 2874 (W. Va 2013)................................................................23

*D.H Blair & Co. v. Gottdiener*, 462 F. 3d 95, 109 (2nd Cir. 2005)..........................23

*Dickson v. Secretary of Defense,* 68 F. 3d 1396, 1404 (D.C. 1995)......................38

*Dyntel Corp. v. Ebner,* 120 F. 3d 488 (4th Cir. 1997)...............................................62

*Freeman v. Stanbern Constr. Co.,* 106 A. 2d 50 (Md. 1954) ........................... 30, 32

*Freeman v. Stanbern Constr. Co.,* 106 A. 2d 50, 54-55 (Md. 1954)......................29

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576 (2008)................................51

*Hoang v. Hewitt Ave. Assocs.,* 936 A. 2d 915, 935 (Md. Ct. Spec. App. 2007) ....................................................................................47

*Hoffman v. Glock,* 315 A. 2d 551 (Md. Ct. Spec. App. 1974) ...............................30

*Hoffman v. Glock,* 315 A.2d 551 (Md. Ct. Spec. App. 1974) ................................29

*Int'l Longshoremen's Ass'n, Local No. 1624 v. Hampton Rds. Shipping,* No. 94-1838, 1995 WL 19321 at •8 (4th Cir. Jan 19, 1995) ........................................................................................57

*Jaguar Land Rover North America, LLC v. Manhattan Imported Cars, Inc.,* 477 Fed. Appx. 84, 88 (4th Cir. 2012) ....................................................27

*JAI Medical Systems Managed Care Organization, Inc. v. Bradford,* 209 Md. App. 68, 57 A.3d 1068 (2012) ........................................................37

*Long John Silver's Restaurants, Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008) .............................................................................. 26, 52

*Marston v. AT&T Corp.,* 89 Fed. Appx. 383, 384 (4th Cir. 2004) ................... 18, 24

*Miller v. Talbott,* 239 Md. 382 (1965) ..................................................................53

*National Mortgage Warehouse, LLC v. Bankers First Mortgage Co.,*

190 F. Supp. 2d 774, 780 (D. Md. 2002)......................................................35

*Patten v. Signator Ins. Agency, Inc.,* 441 F. 3d 230, 234 (4th Cir. 2006) ......... 26, 50

*Perini Cor. V. Perini Constr., Inc.,* 915 F.2d 121, 123 (4th Cir. 1990)....................25

*Progressive Cas. Ins. Co. v. Ehrhardt,* 69 Md.App. 431, 440 (1986)....................33

*Pumphrey v. Pelton,* 245 A. 2d 301, 305 (Md. 1968)..........................................29

*Remmey v. PaineWebber, Inc.,* 32 F.3d 143, 150 (4th Cir. 1994) ...........................57

*Reserve Insurance Co. v. Duckett,* 240 Md. 591, 600-601 (1965) ..........................33

*Speechly Bircham,* 2012 WL 4341574 at •9 ......................................................28

*Speechly Bircham, LLP v. Miller,* 2012 WL 4341574 *9 (2012)............................28

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (U.S. 2010)......................................................................................51

*Stolt-Nielsen, S.A. v. Animal Feeds International Corp.*, 130 S. Ct. 1758, 1768 n.3 (2010)................................................................51

*Taylor v. University Nat'l Bank,* 282A.2d 91 (Md. 1971)...............................30, 31

*Three S Delaware, Inc. v. DataQuick Information Systems, Inc.,* 492 F. 3d 520, 527 (4th Cir. 2007) ......................................................26, 50

*TransDulles Ctr., Inc. v. USX Corp.* 976 F. 2d 219, 226 (4th Cir. 1992)...............39

*U.S. v. Welsh,* 316 Fed. Appx. 222, 224 (4th Cir. 2008) ................................18, 24

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).............................................................................................51, 52

*Upshur Coals Corp. v United Mine Workers, Dist. 31,* 933 F. 2d 225, 228 (4th Cir. 1991)................................................................26, 52

*Wachovia Securities, LLC v. Brand*, 671 F.3d 472, 480–83 (4th Cir. 2012) .........................................................................................26, 51

*Walzl v. King*, 113 Md. 550 (1910).............................................................53

*Washington Metropolitan v. Amalgamated Transit Union,* 804 F. Supp. 2d 457, 476 (Dt. Md. 2011)..........................................................38

## Statutes

28 U.S.C. § 1332(a)(2)...............................................................................1

28 U.S.C. §§ 1291, 1294(1), and 2107 .........................................................2

9 U.S.C. § 10.................................................................................................51

9 U.S.C. sec. 10(a)(4).....................................................................................57

**<u>Rule</u>**

Fed. R. App. Proc. 38....................................................................................62

## JURISDICTIONAL STATEMENT

On March 25, 2014, a Panel of Arbitrators (the "Panel") issued the Arbitration Award ("Award") at issue here.  Joint Appendix ("JA") 496-526. On April 6, 2014, Appellant The Henry M. Jackson Foundation for the Advancement of Military Medicine, Inc. ("Foundation" or "HJF") filed a Motion to Partially Vacate or Modify Arbitration Award in the U.S. District Court for the District of Maryland ("Motion").  JA 7-41.  The District Court's jurisdiction was properly based on 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeded $75,000, exclusive of interests and costs, and the action was between citizens of different states.  On May 6, 2014, Appellee Norwell, Inc. ("Norwell") filed its Counterclaim to Confirm the Arbitration Award and Opposition to Foundation's Motion.  JA 456-485; 486-494.  On May 16, 2014, Foundation filed its Reply in Support of its Motion and a "Reply" to Norwell's Counterclaim.  JA 1047-1077; 1445-1447.  On May 22, 2014, Norwell filed its Reply in Support of its Counterclaim to Confirm the Arbitration Award.  JA 1448-1461.

On May 29, 2014, Foundation's Motion and Norwell's Counterclaim for Confirmation of the Award were heard before Judge Roger W. Titus.  JA 1904. On May 30, 3014, Judge Titus ordered that Foundation's Motion was denied, that Norwell's Counterclaim and Opposition were granted, and that the Award was confirmed, with judgment on the Award entered in favor of Norwell.  JA 1845-

1846.

On June 12, 2014, Foundation filed its Notice of Appeal.  JA 1880-1883.
Pursuant to 28 U.S.C. §§ 1291, 1294(1), and 2107, this Appellate Court has
jurisdiction over this appeal.

## **INTRODUCTION**

Once again, Plaintiff-Appellant the Henry M. Jackson Foundation for the
Advancement of Military Medicine, Inc. (the "Foundation" or "HJF") seeks to
vacate an arbitration award rendered by a Tribunal of three eminent jurists through
the arbitration procedures it demanded.  Notably, Foundation has already made the
same arguments it now raises before this Court twice – once to the arbitration
panel (the "Panel") itself, and again to the District Court.  Having "lost" twice, it
now again seeks to increase Norwell Inc.'s ("Norwell") litigation costs and have
this Court reconsider the same legal arguments presented to the Panel and District
Court, notwithstanding the District Court's strong statement that, if it were hearing
this matter with broad authority, Foundation would not prevail on its appeal.  For
example, the Court stated, "In reviewing this award as a whole, if I were to have
the power of a Fourth Circuit judge… I would not be inclined to disturb this award
even if I had that broad authority..."  JA 1995 (Transcript, 52:10-14).  Judge Titus
went on to state, "I conclude that even if I had the authority to probe into this
matter as deep as the Fourth Circuit could do in reviewing one of my rulings, that

this was a ruling that is consistent with Maryland law and that there is no legal infirmity in the panel's reliance upon this as being an effective agreement such that would justify vacating the award." JA 1959 (Transcript, 56:13-19). Likewise, Judge Titus reiterated, "But, [The Award] certainly, as I said before, would to me pass muster if I had the authority of the Fourth Circuit to review it." JA 1962 (Transcript 59:3-6).

Notwithstanding this very strong language, Foundation brought the instant appeal. Accordingly, Norwell effectively refutes each of Foundation's points below, as it has done twice previously, and requests an award of attorneys' fees and costs due to the frivolous nature of this appeal.

## STATEMENT OF ISSUES

Foundation has raised the following issues:

1. Did the District Court's errors concerning the type of motion at issue, the standard of review and the record sufficiently infect the proceedings so that vacatur is required?

2. Did the District Court err by failing to vacate the Arbitration Panel's decision because the Panel: (i) ignored the plain language of the HJF/Norwell Agreement requiring contract amendments to be signed and allowed two unsigned emails to amend the Agreement; (ii) allowed a third party, who was an Army official and Norwell adviser, to bind HJF via those emails and amend the Agreement; and/or

[3]

(iii) allowed those emails, which predated the Agreement, to amend the Agreement?

3. Did the District Court err by failing to vacate the Panel's decision because the Panel: (i) improperly reinstated, and then rewrote terms of, the Agreement and awarded both specific performance and breach of contract damages; (ii) awarded contractually prohibited consequential damages, which were based on collateral and contingent events; and/or (iii) erroneously ruled in Norwell's favor when it did not prove causation?

4. Did the District Court err by failing to vacate the Panel's decision, where the Panel so "imperfectly executed" its power "that a mutual, final and definite award … was not made"?

## STATEMENT OF THE CASE

### a.     The Dispute That Gave Rise to the Arbitration.

Foundation is a tax-exempt corporation that serves as the licensing arm and clinical trial administrator of the Uniformed Services University of the Health Sciences ("USU"), and operates a joint venture with the USU out of which Norwell licensed technology.  Dr. George Peoples ("Peoples") is the inventor of the GP2 technology and is a medical doctor actively working with both of Norwell's direct competitors, Galena and Antigen Express, who are developing the competing drugs, E75 and AE37 respectively.  Peoples until recently was a

member of the Army and held an appointment at the USU.  The Army assigned the

GP2 patent rights to the USU and the HJF.  Peoples is stated as the Foundation's

representative in clinical site agreements between the Foundation and the clinical

sites participating in the GP2 clinical trial.  JA 1523-1548; 1550-1571; 1573-1595;

1595-1618; 1620-1658; 1660-1708; 1710-1736; 1738-1759.  Through these

agreements, a clinical trial network for GP2 was created, managed, and controlled

by the Foundation, who also entertained sponsored research agreements with

Norwell's competitors who were also having their drugs tested at the same clinical

sites.  The core function of these clinical site agreements is for all GP2 data and

FDA correspondence to flow between the clinical sites and Foundation employees

in exchange for cash payments from the Foundation to the clinical sites, and for

these clinical sites to follow a specific clinical trial protocol.  The Foundation

effectively serves as the clinical research organization for the GP2 clinical trial,

with full, undisputed obligation to complete the treatment of each patient that it

enrolls into the GP2 clinical trial per the existing clinical trial protocol that is

reviewed by the FDA.  JA 664-722.  Mark Scher ("Scher") is the Director of

Technology Transfer & Commercialization of the Joint (USU & HJF) Office of

Technology Transfer (JOTT) which was established in 2000 to advance inventions

by HJF and USU researchers.

[5]

i. The GP2 License Agreements and Sponsored Research of the GP2 Clinical
   Trial.

Norwell licensed worldwide commercialization rights for GP2 from the
Foundation.  In addition Norwell agreed to financially sponsor the ongoing GP2
phase II clinical trial through the Foundation's clinical trial network for which
Norwell would receive the necessary GP2 data and FDA correspondence from the
Foundation, amongst other important information and rights, in order to take over
the clinical trial, contact the FDA, prosecute patents, seek new investors and
strategic partners, all of whom relied on a real time accounting of clinical trial
progress, clinical trial results and data, active engagement with the FDA, and
Norwell's leadership in continuing the clinical development of GP2.  When a
patient was enrolled, Norwell's clinical trial payment schedule was calculated for
Norwell to pay the Foundation ($10,000 to $15,000 per patient enrolled) upfront
for the entire treatment course for that patient, with all responsibilities for
treatment to be completed by the Foundation through its clinical site agreements
for no additional consideration from Norwell.  JA 1523-1548; 1550-1571; 1573-
1595; 1595-1618; 1620-1658; 1660-1708; 1710-1736; 1738-1759.  The trial was
designed to last 5 years, yet the clinical trial support payments were to be paid over
3 years.  More specifically, the original calculation of $3m was to be paid by
Norwell over the first 3 year enrollment period on a per patient basis based on the

[6]

3 year enrollment schedule committed to by the Foundation and Peoples, and not over the subsequent 2 year treatment period (an additional 2 years after last patient was enrolled). Furthermore, the extensive testimony during the arbitration hearing gave the Panel a full understanding that the obligation to treat the patients rests with the clinical sites, who were under contract with the clinical trial network manager, the Foundation, and not Norwell.  In addition, Peoples represented multiple times that he would transfer the IND to Norwell for no additional consideration (Plan A), but Norwell always reserved the right, due to its licensed rights to all GP2 data and FDA correspondence, to obtain its own IND from the FDA (Plan B) and gain complete independence from Peoples as it took control of the current trial and organized for future clinical trials.

Norwell first met with Peoples and Scher in January 2008.  JA 566 (10/21/13 Transcript, 15:12-20).  On April 16, 2008, Peoples sent an email to Eric Rothe ("Rothe"), founder of Norwell, copied to Scher, confirming that the Exclusive License Agreement between Foundation and Norwell, with an effective date of April 24, 2009 ("2009 Agreement") included sponsored research, stating "part of the license deal has to be research funding to help support these trials.  As we've discussed, we'll need in the range of $3M." JA 640-643.  Moreover, HJF identified Norwell as a "for-profit sponsor" of the GP2 arm of the clinical trial.  JA 645-646; 530-531 (10/15/13 Transcript, 389:22-390:8).  Additionally, Beth

Mittendorf ("Mittendorf"), the principal investigator of the GP2 trial, testified that the clinical trial is paid for by Norwell.  JA 556 (10/16/13 Transcript, 17:7-17).  HJF admittedly allowed Peoples to negotiate cost-per-patient and patient enrollment pursuant to an "exception."  JA 532- 536; 537 (10/15/13 Transcript, 398:10-402:12, 411:1-15).  On December 26, 2008, Peoples sent an email to Rothe, confirming the understanding that Norwell would be charged $10,000 per patient, without a CTC assay.  JA 648-650.  Peoples confirmed the cost per patient would be $15,000, which includes a CTC assay, and patient enrollment in an email sent May 7, 2009, copied to Scher.  JA 652-653; 538-539 (10/15/13 Transcript, 413:2-11, 414:11-21 (Scher allowed Peoples to send this email as part of the "exception.")); 567-571  (10/21/13 Transcript, 16:16-20:2) 578-587 (10/21/13 Transcript, 30:7-39:22); 588-594 (10/21/13 Transcript, 104:20-110:11).  Peoples stated, "we'll base everything off an enrollment target of 180 patients," "we'll agree to accept $3M for the entire trial," and "[b]y signing this agreement, you'll be agreeing to pay for these patients as a proportion of the total."  JA 652-653.  Norwell believed "we" included HJF.  Peoples further confirmed the patient enrollment schedule in emails dated August 28, 2009 and September 16, 2009 – showing that at least 250 patients would be enrolled by the end of 2011, which was consistent with the existing protocol. JA 655-656; 658-662; 664-722 (Protocol, page 29 and 36).

[8]

Scher did not make it clear that Peoples was not representing HJF – at no point did Scher respond to any of the numerous emails or conversations between Norwell and Peoples to inform Norwell that Peoples was not authorized to negotiate on behalf of HJF.  JA 572 (10/21/13 Transcript, 21:14-17).  Likewise, Peoples did not make it clear that he was not representing HJF.  JA 577 (10/21/13 Transcript, 27:17-21).  To the contrary, Norwell believed that Peoples was responsible for negotiating "cost per patient, running of the trial… the sponsored research within the license."  JA 572-573(10/21/13 Transcript, 21:18-22:6); 574-576 (10/21/13 Transcript, 24:18-26:12); 640-643.  Scher confirmed Norwell's belief that Peoples was authorized to negotiate terms of the Primary License by an email dated April 30, 2009, stating, "3.6 – After discussions with Dr. Peoples we believe this language better reflects his discussions with Norwell."  JA 724-725; 727-782.  As discussed below, and as determined by the Panel, these facts meet the requirements of apparent authority under Maryland law.

Moreover, Norwell believed it would be provided "all" GP2 data and "all" FDA correspondence, "without delay", as part of the 2009 Agreement and the First Amendment to the 2009 Agreement, dated February 17, 2010 ("First Amendment").  Scher confirmed Norwell's understanding in an email agreement dated February 1, 2010, a mere eight days before execution of the First Amendment, stating, "The data will be jointly owned but the trial-specific

[9]

documents, databases, and IND remain in the possession of the Foundation/Dr. Peoples. We will coordinate all FDA submissions in conjunction with Norwell." JA 784-786; 547-549 (10/15/13 Transcript, 441:8-443:1). On February 29, 2012, Norwell specifically requested all Case Report Forms in line 2 of Appendix A. JA 788-808. On at least eight occasions, Norwell requested copies of "all" GP2 data and/or FDA correspondence - May 13, 2010, February 7, 2011, February 8, 2011, April 15, 2011, May 2, 2011, August 3, 2011, and December 17, 2011, and February 29. 2012. JA 810-814; 816-821; 823-824; 826-832; 788-808; 834-883; 885-904; 906-915.

Peoples and Scher refused to allow Norwell to copy the FDA correspondence. JA 810-814; 917; 823-824; 826-832. Peoples and Scher formulated multiple excuses to prevent Norwell from copying the FDA correspondence - Scher claimed that HJF did not have the requested documents, and Peoples testified that the FDA correspondence was too large to be copied or scanned, occupying an entire bookshelf spanning an entire wall, even though the license required these documents to be produced "without delay." JA 563 (10/17/13 Transcript, 284:3-8). Yet, HJF represented that the entire universe of FDA correspondence was provided at the hearing in C442, totaling 7,138 pages, which fits on one DVD and in 11 binders. JA 595-597 (10/21/13 Transcript, 285:18-287:11). Scher went so far as to state, "the Foundation does not possess

[10]

any FDA correspondence relating to GP2," even though he did not confirm this with the appropriate HJF employees.  JA 906-915; 529 (10/15/13 Transcript, 383:16-22 (Scher states that two days before his deposition, he found out that Marianne Spevak and the regulatory department at HJF had FDA correspondence.)).  Marianne Spevak, a HJF employee located at HJF headquarters, and Silvija Salai, a HJF employee, possessed all FDA correspondence and some CRFs and GP2 data, and could have easily provided access to Norwell, or could have easily mailed the entire FDA correspondence "without delay" on one CD to Norwell. JA 561-562 (10/17/13 Transcript, 237:12-238:3).  With respect to the GP2 data, on May 4, 2011, Scher also stated that "the Foundation just recently came into possession of some data from the clinical trial," knowing that Laura Ferrise, a HJF employee, had the entire GP2 database on her computer, including CRFs and was ready and willing to send it to HJF and Norwell.  JA 934-935 (Ferrise Depo, 73:16-74:6); 936 (Ferrise Depo, 88:7-9).  Also, Balan Ponniah, a GP2 co-inventor and HJF employee, received GP2 samples and possessed all GP2 sample data on his computer, along with his staff which was also employed by HJF, and could have easily emailed the data to HJF or Norwell. JA 940-946 (Ponniah Depo, 112:11-118:8).

Not surprisingly, Foundation changed its story at the arbitration hearing. Foundation claimed Peoples had no authority to negotiate terms of the Primary

[11]

License, even though Mark Scher admittedly incorporated these negotiations into the terms of the Primary License. Foundation claimed that no representation was made regarding enrollment – one patient could be enrolled per year, and Norwell would still be required to pay the fees pursuant to the Primary License. Foundation claimed that the same placebo group for AE37 could be used for GP2, even though the two drugs treat different patient populations. Foundation claimed that it did not have FDA correspondence or GP2 data in its possession, even though its employees maintained binders of FDA correspondence at HJF's headquarters, and generated GP2 databases from case report forms and patient samples. The clinical site agreements specifically require performance by the site to be paid, and all data is paid for by Foundation personnel and received by Foundation personnel.

Peoples is even named as the "Foundation Principal Investigator" functioning as one of the many Foundation "representatives" in these agreements. JA 1523-1548 (at 1527); 1550-1571 (at 1553); 1573-1595 (at 1576); 1595-1618 (at 1601); 1620-1658 (at 1640); 1660-1708 (at 1690); 1710-1736 (at 1716); 1738-1759 (at 1745).

**ii.**     <u>Foundation's Wrongful Termination and Breach of the Agreement</u>**.**

On March 16, 2012, Foundation sent Norwell a Notice of Termination of its license rights due to non-payment. However, Foundation failed to mention that its termination was wrongful, as Foundation's material breaches of the 2009

[12]

Agreement, License Agreement between Foundation and Brigham and Women's Hospital, Inc., and Norwell, with an effective date of February 16, 2010 ("2010 Agreement"), First Amendment, and second amendment to the 2009 Agreement ("Second Amendment") (collectively, the "Agreements"), that had been occurring for many prior years, excused Norwell from performance under the contracts prior to Norwell's failure to cure its non-payment.  JA 499.

Regardless of the Panel's finding that Foundation wrongfully terminated the licenses, Foundation insists that its termination was proper.  Foundation's dislike of the Panels' determination is not grounds for vacation.  The Panel states, "In summary, HJF's termination of both the 2009 and 2010 License Agreements was not justified and constituted a wrongful termination of those contracts."  JA 496-526, at 512.  The Panel's ruling and logic are clear.

Furthermore, the Panel determined that Foundation's actions caused Norwell to lose Texas Emerging Technology Fund ("ETF") funding.  Foundation mischaracterizes the ETF.  The Texas ETF was not a grant – it was equity.  Like any other investor, the ETF expected Norwell to be able to use and control the GP2 data from the clinical trial, including obtaining an IND, in order to develop the drug.  Naturally, without access to the data showing positive results, and FDA correspondence demonstrating that the trial was progressing pursuant to the applicable regulations, no investor (including the ETF) would give money to

[13]

Norwell.

The Foundation unilaterally terminated patient enrollment after the hearing but before the Panel's award, despite an agreement to the contrary in the May 7, 2009 agreement. Thus both parties prepared statements and sworn testimony to discuss the topic of premature termination of enrollment of patients, including declarations from Mittendorf, Patel, and Rothe. JA 919-930.

Ultimately, the Panel concluded that Foundation breached the Agreements. Foundation failed to provide Norwell with clinical data and FDA correspondence, as required under the Agreements. Evidence provided to the Panel showed that these breaches had been occurring for many years prior to the wrongful termination, and that Foundation had refused to cure these breaches, despite repeated written attempts by Norwell to amicably cure these breaches in 2011 and early 2012. JA 810-814; 816-821; 823-824; 826-832; 788-808; 834-883; 885-904; 906-915. The Panel ruled that these material breaches blocked Norwell and caused Norwell to lose ETF funding in January 2012, which would have satisfied Norwell's financial support obligations pursuant to §4.2 of the 2009 and 2010 Agreements.

In the end, the Panel saw through Foundation's baseless claims, and sided with Norwell. The District Court followed by denying Foundation's Motion to Vacate, and confirming the arbitration award.

[14]

b.     **The Arbitration.**

Due to Foundation's breach of the Agreements, Norwell insisted its "termination" was wrongful, and continued its attempts to further GP2 as a potentially life-saving vaccination.  Pursuant to § 11.18 of the 2009 Agreement, Norwell made many attempts to informally resolve this matter.[1]  On November 27, 2012, Foundation filed a Demand for Arbitration.  On December 14, 2012, Norwell submitted its Counterclaims and Affirmative Defenses.  On March 6, 2013, Norwell submitted its revised Counterclaims and Affirmative Defenses.  The parties conducted extensive written discovery and depositions.  On October 8, 2013, the parties submitted pre-arbitration briefs.  During October 15-24, 2013, the Panel conducted an arbitration hearing in Bethesda, Maryland, which consisted of two weeks of live witness testimony, sworn statements, over 800 exhibits, and oral argument.  The parties submitted post-hearing briefs on November 25, 2013, proposed awards, and supplemental briefing regarding Foundation's premature termination of patient enrollment into the GP2 study.  The record was closed February 24, 2014.  The Panel issued its award on March 25, 2014.

---

[1] §11.18 reads, in relevant part, as follows:

§11.18 Disputes.  In the event of any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof, the Parties shall try to settle such conflict amicably between themselves.  Subject to the limitation stated in the final sentence of this Section, any such conflict that the Parties are unable to resolve promptly shall be settled through arbitration conducted in accordance with the rules of the American Arbitration Association. … The award through arbitration shall be final and binding.

**c.**     <u>**Selection of the Panel.**</u>

The parties mutually agreed upon selection of a three-person arbitration panel.  After conveying requested background, the AAA submitted a list of arbitrators for the parties to select from.  The parties agreed upon the three selected arbitrators.

**d.**     <u>**The Award.**</u>

On March 25, 2014, the Panel issued its Award.  JA 496-526.  Notably, the Panel determined that Foundation breached the Agreements, wrongfully terminated Norwell's rights to GP2, and was the direct and proximate cause of Norwell's failure to obtain ETF funding.

Foundation emphasizes the irrelevant point that the Award "represents the majority opinion."  There is no requirement, in the Agreements or otherwise, that a unanimous decision must be rendered for the Award to be final and binding.  In fact, §11.18 of the 2009 Agreement states, "The award through arbitration shall be final and binding."  Unfortunately, what should have been an expedited process has now been dragged out by Foundation's Motion and appeal.

**e.**     <u>**The District Court Proceeding.**</u>

On April 6, 2014, Foundation filed a Motion to Partially Vacate or Modify Arbitration Award in the District Court ("Motion").  JA 7-45.  On an April 21,

[16]

2014, conference call, Judge Titus proposed Foundation's Motion "be treated as Plaintiff's Motion for Summary Judgment," And issued an Order regarding same. JA 454-455. Foundation did not object at any time to Judge Titus' proposal, even during the oral hearing, and now improperly raises this objection for the first time on appeal.

On May 29, 2014, Foundation's Motion and Norwell's Counterclaim for Confirmation were heard. On May 30, 2014, Judge Titus issued an order denying Foundation's Motion, and granting Norwell's Counterclaim. JA 1845-1846. Foundation subsequently filed the instant appeal. JA 1880-1883. Norwell agreed to a stay of enforcement on the Award pending this appeal. JA 1884-1893.

## SUMMARY OF ARGUMENT

First, contrary to Foundation's allegations, the District Court's consideration of Foundation's Motion to Vacate, applied standard of review, and the record do not warrant vacatur. Judge Titus held a conference call on April 21, 2014, where the parties' counsel discussed a briefing schedule and treatment of Foundation's Motion to Vacate as a Motion for Summary Judgment. Foundation had the opportunity to raise an objection to the District Court's treatment of Foundation's Motion to Vacate five times: (1) during the April 21, 2014, conference call; (2) Foundation's reply in support of its Motion; (3) Foundation's answer to Norwell's Counterclaim; (4) Foundation's opposition to Norwell's Cross-Motion for

Summary Judgment; and (5) at the May 29, 2014, District Court hearing. Notably, Foundation failed to object. Because Foundation failed to raise this issue before the District Court, it is waived. *U.S. v. Welsh,* 316 Fed. Appx. 222, 224 (4th Cir. 2008) (Even if law was violated and appellant had standing to raise such violation, he has waived review of the claims by failing to raise them before the district court.); *Marston v. AT&T Corp.,* 89 Fed. Appx. 383, 384 (4th Cir. 2004) (Appellant waived her claim by failing to raise the claim in district court.).

Moreover, Foundation's argument is patently illogical. They claim this Court should apply the "clearly erroneous" standard of review applicable to motions to vacate instead of de novo review applicable to motions for summary judgment. However, the de novo standard benefits Foundation – under this standard, the district court is given little, if any, deference; the opinion appealed receives little or no presumption of correctness. The clearly erroneous standard of review is slightly more deferential to the district court.

Foundation also raises for the first time the issue that the entire record before the Panel was not presented before the District Court. This argument is also unreasonable and waived. Foundation had the option to present whichever documents it desired the district court to consider. Now claiming that its own error in failing to produce the entire record to the District Court somehow warrants vacatur is preposterous.

[18]

Second, the District Court did not err by failing to vacate the Panel's decision based upon Foundation's unfounded allegations that the Panel (a) ignored the plain language of the agreements requiring contract amendments to be signed, (b) allowed Peoples to bind Foundation, and (c) allowed emails to amend the agreement. The Panel did not ignore the 2009 Agreement's provision requiring amendments to be signed. Instead, the Panel found that a valid agreement was formed by an exchange of emails between Peoples, as Foundation's apparent agent, and Norwell. The Panel determined, after 2 weeks of hearing the evidence and testimony of witnesses and experts, review of over 800 exhibits, months of discovery and depositions, multiple dispositive motions, and extensive briefs and proposed awards from both parties, that Peoples was the apparent agent of Foundation. Foundation attempts to re-argue the evidence presented at the arbitration hearing and during the District Court proceeding. The arbitral award and District Court Order were supported by ample evidence, and Foundation's attempts to re-litigate these issues are improper. Foundation also asserts that the Panel re-wrote the 2009 Agreement to include, *inter alia*, an email from a third party. The Panel found that the May 7, 2009 email sent by Peoples, agreed to by Norwell, and copied to Mark Scher of Foundation , was incorporated into the 2009 Agreement because it was dated after the effective date of the 2009 Agreement. JA 518.

[19]

Third, the District Court did not err by failing to vacate the Panel's decision based upon Foundation's allegations that the Panel (a) improperly awarded specific performance and breach of contract damages, (b) awarded consequential damages, and (c) ruled in Norwell's favor when it did not prove causation. The Panel did not manifestly disregard the law or ignore the evidence presented. Foundation asserts that the Panel disregarded Maryland law by awarding both damages and specific performance as remedies for breach of contract. Foundation's argument misstates the law, and confuses the election of remedies doctrine with the current law regarding damages. An award of specific performance and monetary damages is not prohibited under Maryland law, especially since damages alone are an inadequate remedy considering the uniqueness of GP2. Foundation asserts that the Panel awarded indirect, consequential damages in violation of provision 11.3 of the 2009 Agreement. Foundation is mistaken. The Panel found Norwell's loss of the $2,500,000 ETF funding, and funding from *any investor*, arose naturally from Foundation's refusal to provide Norwell with the clinical trial data and FDA correspondence, required to be provided to Norwell through provisions of the 2009 Agreement and needed to obtain funding, and Foundation's wrongful termination of the 2009 Agreement. Without clinical trial data and FDA correspondence, Norwell was required to approach investors with merely its word that GP2 was a valuable drug and Norwell could not obtain its own IND to take control of the GP2

[20]

drug trial and prove its independence from Peoples, who was conflicted by aggressively aiding Norwell's competitors. Accordingly, Foundation's wrongful conduct was "the proximate and direct cause of damage to Norwell in the amount of $2,500,000," and accordingly, a direct damage. JA 496-526, at 512. This ties directly into causation – because Norwell proved that Foundation was the proximate cause of its lost funding, and it was foreseeable and reasonably certain that Norwell would be unable to raise funds if Foundation failed to provide the GP2 data and FDA correspondence needed to approach investors, the causation requirement was met. Furthermore, the Panel was balanced and fair in their ruling as Norwell was not relieved of the majority of its obligations in the 2009 License including substantial future payments to the Foundation.

Lastly, the Panel issued a "mutual, final, and definite award upon the subject matter submitted." Although Foundation makes a point to state the Panel was "divided" in its decision, Foundation has no proof of this allegation – the award merely states that "a majority" of the Panel rendered the award. Even if one panelist disagreed with the majority, the majority decision is binding on Foundation. Foundation selected the arbitration procedures at issue here, and cannot now claim that a unanimous decision must be rendered. A plain reading of the Award demonstrates that Foundation's and Norwell's claims were decided on the merits. The reasoned award at issue is thirty-one (31) pages long, includes

procedural background, history of the dispute, a complete discussion of Foundation's contract claims and Norwell's affirmative defenses thereto, Norwell's contract counterclaims, Foundation's early termination of patient enrollment into the GP2 study, and Norwell's tort Counterclaims. JA 496-526. The Panel's award is very clear and supportive of the Foundation's objective to advance military science, as it permits Norwell to continue the commercialization of GP2, pursuant to the 2009 License. A major negative impact to the clinical trial is that Foundation prematurely terminated patient enrollment, giving the trial little chance of reaching statistical significance based on the current data, which will make it hard to find a large pharmaceutical partner in the near term. The Foundation's improper termination of enrollment may leave the drug unfundable and impossible to advance because of insufficient data – a situation created by Foundation, not Norwell or the Panel or the District Court. The Panel has thus empowered Norwell through the ruling, confirmed by the District Court, to rectify the situation and enroll its own patients to combine with the Foundation's patients through an IND opened and controlled by Norwell. To open up its own IND, Norwell needs Foundation to comply with the 2009 License and Panel's order by providing all GP2 data, FDA correspondence, and other relevant information such as IP and publication update. It is also clear from the clinical site agreements between the clinical sites and the Foundation and the testimony during the

arbitration hearing that the majority of Norwell's $2.1million paid to the

Foundation is more than sufficient to cover the full treatment costs of all patients

recruited to date, that Foundation is responsible for treating these patients, and that

there is no harm to cancer patients in the trial. JA 1523-1548; 1550-1571; 1573-

1595; 1595-1618; 1620-1658; 1660-1708; 1710-1736; 1738-1759.  In addition,

there is no harm to cancer patients in general, as the Panel has provided a path

forward for the commercialization of GP2, with Norwell taking the lead, and the

Foundation supporting Norwell as the lead, which was the intent of the

Agreements in the first place.

## **ARGUMENT**

## I.    **The District Court's Treatment of Foundation's Motion to Vacate.**

Contrary to Foundation's argument, motions to vacate have been properly

treated as motions for summary judgment.  *D.H Blair & Co. v. Gottdiener*, 462 F.

3d 95, 109 (2nd Cir. 2005) (Court found that the motion to confirm in part and

vacate in part the award of an arbitration panel should have been treated as akin to

a motion for summary judgment based on the movant's submissions."};

Consolidation Coal Co. v. United Mine Workers of America, 196 L.R.R.M. (BNA)

2874 (W. Va 2013) (Likewise, the converse is true - motion for summary judgment

treated as a motion to vacate).

Regardless, Foundation's argument fails.  The District Court's treatment of

Foundation's Motion to Vacate as a Motion for Summary Judgment was in name only. In fact, the District Court applied the appropriate standard of review for a motion to vacate to Foundation's Motion to Vacate. JA 1959-1960 (Transcript 56:22-57:9).

Judge Titus held a conference call on April 21, 2014, where the parties' counsel discussed a briefing schedule and treatment of Foundation's Motion to Vacate as a Motion for Summary Judgment. Foundation had the opportunity to raise an objection to the District Court's consideration of Foundation's Motion to Vacate five times: (1) during the April 21, 2014, conference call; (2) Foundation's reply in support of its Motion; (3) Foundation's answer to Norwell's Counterclaim; (4) Foundation's opposition to Norwell's Cross-Motion for Summary Judgment; and (5) at the May 29, 2014, District Court hearing. Notably, Foundation failed to object. Because Foundation failed to raise this issue before the District Court, it is waived. *U.S. v. Welsh,* 316 Fed. Appx. 222, 224 (4th Cir. 2008) (Even if law was violated and appellant had standing to raise such violation, he has waived review of the claims by failing to raise them before the district court.); *Marston v. AT&T Corp.,* 89 Fed. Appx. 383, 384 (4th Cir. 2004) (Appellant waived her claim by failing to raise the claim in district court.).

Moreover, Foundation's argument is patently illogical. They claim this Court should apply the "clearly erroneous" standard of review applicable to

motions to vacate instead of de novo review applicable to motions for summary judgment. However, the de novo standard benefits Foundation – under this standard, the district court is given little, if any, deference; the opinion appealed receives little or no presumption of correctness. The clearly erroneous standard of review is slightly more deferential to the district court.

Additionally, Foundation raises for the first time the issue that the entire record before the Panel was not presented before the District Court. This argument is also unreasonable and waived. Foundation had the option to present whichever documents, and whatever testimony, it desired the district court to consider. In fact Foundation had ample opportunities to do so. Now claiming that its own error of failing to produce the entire record before the Panel somehow warrants vacatur is preposterous. The parties presented the relevant briefs, documents, and testimony to the District Court, and now present the same to this Appellate Court.

## II.    <u>**Standard of Review.**</u>

This Court reviews a grant of summary judgment *de novo*, applying the same standard as the district court, but without deference to the district court. *Perini Cor. V. Perini Constr., Inc.,* 915 F.2d 121, 123 (4th Cir. 1990). The Fourth Circuit has noted two common law grounds for vacation: (1) "where an award fails to draw its essence from the contract;" and (2) where "the award evidences a manifest disregard of the law." *Three S Delaware, Inc. v. DataQuick*

*Information Systems, Inc.,* 492 F. 3d 520, 527 (4th Cir. 2007) (citing *Patten v.*

*Signator Ins. Agency, Inc.,* 441 F. 3d 230, 234 (4th Cir. 2006)) (internal quotation

marks omitted).  The Court uses a two-part test – in order to vacate an award for

manifest disregard, the moving party must show that: (1) "'the applicable legal

principle is clearly defined and not subject to reasonable debate'"; and (2) "'the

arbitrator[] refused to heed that legal principle.'" *Wachovia Securities, LLC v.*

*Brand*, 671 F.3d 472, 480–83 (4th Cir. 2012) (quoting *Long John Silver's*

*Restaurants, Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008)).  As demonstrated

below, Foundation has failed to satisfy its heavy burden.

Notably, the standard for manifest disregard of the law is extremely high.

An arbitrator's award is entitled to a special degree of deference on judicial review.

*Upshur Coals Corp. v United Mine Workers, Dist. 31,* 933 F. 2d 225, 228 (4th Cir.

1991).  Not only is an arbitrator's fact finding and contract interpretation accorded

great deference, but its interpretation of the law is accorded great deference as

well.  *Id.* at 229.  "An arbitration award is enforceable '*even if the award resulted*

*from a misinterpretation of the law, faulty legal reasoning or erroneous legal*

*conclusion*,' and may only be reversed 'when arbitrators understand and correctly

state the law, but proceed to disregard the same.'" *Id.* (emphasis added) (citations

omitted).  As demonstrated below, Foundation's arguments that the Panel

misinterpreted the law, used faulty legal reasoning, or came to an erroneous legal

[26]

conclusion, are not grounds to vacate the award.

The District Court applied the appropriate test, and rendered a decision in favor of Norwell.  As demonstrated below, each factor indeed weighs heavily in Norwell's favor.

## III.    The Panel did not Disregard Law or the Language of the 2009 Agreement by Finding the May 7, 2009, Email Incorporated into the 2009 Agreement.

Maryland law is clear – the presence of an integration clause does not automatically resolve the parties' actual intention regarding integration.  *Jaguar Land Rover North America, LLC v. Manhattan Imported Cars, Inc.,* 477 Fed. Appx. 84, 88 (4th Cir. 2012).  "Courts in Maryland have explained that even the use of an unambiguous phrase, such as 'this contract contains the final and entire [a]greement between the parties,' is not invariably conclusive…"  Id.

Moreover, an integration clause merges all prior and contemporaneous agreements in regard to the written contract, but does not have the same effect on subsequent agreements.  *Adams v. Wilson*, 264 Md. 1, 12 (1971).  The Panel determined that even though the parties signed the 2009 Agreement after the effective date of April 24, 2009, their signatures were given retroactive effect.  JA 496-526, at 518.  Accordingly, the May 7, 2009 email exchange constituted a subsequent agreement, which was not erased by the integration clause contained in

[27]

section 11.19 of the 2009 Agreement.

Foundation also raises a different issue – whether the parties could only modify the 2009 Agreement with a document that was executed under the same formality as the original document. Maryland law is clear – a binding written contract can be formed by exchange of emails, even where the parties do not print and physically sign a document. *Speechly Bircham, LLP v. Miller,* 2012 WL 4341574 *9 (2012) (The Court scrutinized a series of emails and was satisfied that they serve as a basis for a reasonable juror to conclude that the parties entered into a contract.). Here, Peoples presented an agreement to Eric Rothe via the May 7, 2009, email, which contained an enrollment target of 180 patients (and agreeing that up to 300 patients may need to be enrolled "as determined by the statistics"), presenting a cost per patient, and agreeing to accept a lump sum of $3 million for the entire trial. JA 652-653. Peoples' email concluded with "Acceptable?," to which Eric Rothe responded, "Yes, acceptable." *Id.* Mark Scher of the Foundation was copied on each email. *Id.* In light of Peoples' apparent authority to negotiate on behalf of Foundation, this constitutes a "written instrument signed by each Party." *Speechly Bircham,* 2012 WL 4341574 at •9. Accordingly, the Panel did not disregard law by finding the May 7, 2009, email constituted a valid and enforceable agreement.

Furthermore, and as emphasized by the District Court, the parties may waive

the requirements of a written contract by subsequent agreement and by their

conduct. *See, Hoffman v. Glock,* 315 A.2d 551 (Md. Ct. Spec. App. 1974);

*Freeman v. Stanbern Constr. Co.,* 106 A. 2d 50, 54-55 (Md. 1954) ("However,

such a clause may be waived by implication as well as by express agreement.");

*Pumphrey v. Pelton,* 245 A. 2d 301, 305 (Md. 1968) (the conduct of parties to a

contract may be evidence of a subsequent modification of their contract.). As the

District Court stated:

> And here, you've got an agreement that a panel of arbitrators with considerable testimony and evidence before them, they conclude had an amendment made by virtue of an email exchange which they found as a matter of fact was done by somebody authorized to bind the Foundation and they concluded that it was effective to modify the agreement. The question here is does that mean that there's a mistake here of law that's profound enough to justify an overturning of the arbitrators' award because of the failure to comply with the niceties of amendment. And Maryland law has pretty consistently said no, that's not the case.

JA 1957-1958 (Transcript, 54:16-55:2).

Foundation points to two documents with the title "Amendment," both

signed by the Parties, as evidence that all amendments or subsequent negotiations

needed to be in writing and physically signed. Foundation fails to mention that

Norwell and Foundation had established a course of conduct such that terms of the

license, clarifications to the license, decisions regarding patents, and modifications

to the conduct of the clinical trial were agreed upon via email. For example, Scher

confirmed by email following multiple telephone conversations that the data will

[29]

be jointly owned but the trial-specific documents, databases, and IND remain in the possession of the Foundation/Dr. Peoples in an email dated February 1, 2010. JA 784-786.  This email agreement was relied upon when Norwell entered into subsequent agreements and continued to make clinical trial support payments.

Foundation also points to a December 2008 email exchange, which the Panel refused to find was a valid agreement.  Foundation's reliance is misplaced.  The December 2008 email exchange clearly occurred prior to the 2009 Agreement and, accordingly, was a "prior oral or written communication" extinguished by §11.19 of the 2009 Agreement.

Foundation also argues that the May 7, 2009, email exchange predated the April 24, 2009, Agreement.[2]  This is simply not true.  Clearly, Foundation's efforts are misplaced.

Foundation also attempts to distinguish the three cases cited by the District Court on this issue.  As discussed below, the District Court's reliance on *Taylor v. University Nat'l Bank,* 282A.2d 91 (Md. 1971); *Hoffman v. Glock,* 315 A. 2d 551 (Md. Ct. Spec. App. 1974); and *Freeman v. Stanbern Constr. Co.,* 106 A. 2d 50 (Md. 1954) is appropriate.

Foundation attempts to distinguish *Hoffman* on the basis that in *Hoffman,* a

---

[2] As discussed above, although the April 24, 2009, Agreement was executed May 13, 2009, the Panel determined that the signatures were retroactive to the effective date of the Agreement – April 24, 2009.

recitation that the contract represents the entire agreement between the parties is not present. Foundation fails to mention a crucial portion of the "Entire Agreement" provision of the Agreement, which states, "This Agreement constitutes the complete agreement between the Parties concerning the subject matter hereof and replaces any **prior oral or written communications** between the Parties." JA 1020-1045, at 1043, § 11.19 (emphasis added). Since the May 7, 2009, email exchange occurred after the effective date of the April 24, 2009, Agreement, it was not extinguished by Provision 11.19. Furthermore, as discussed above, the parties engaged in a course of conduct supporting email modifications and clarification of license terms. JA 784-786.

Likewise, the District Court's reliance on *Taylor* is well-placed. In *Taylor,* a bank sought to recover on unpaid notes connected with defendants' retail installment sales agreements and endorsed to the bank. *See generally, Taylor v. University Natl. Bank*, 282 A. 2d 91 (Md. 1971). The Court of Appeals held that the original loan agreement was effectively modified by execution of a subsequent guarantee agreement between the bank and defendants and by the act of negotiating to the bank notes which provided for recourse against the defendants, even though the original agreement provided that such modification required affirmative contract in writing executed by bank, and no such writing was made. *Id.* at 94. Likewise, here the conduct of the parties to a contract was evidence of a

[31]

subsequent modification – the 2009 Agreement was effectively modified by the May 7, 2009, email exchange.

The District Court's reliance on *Freeman* is also correct. *Freeman* revolved around a dispute between a general contractor and subcontractor. *See generally, Freeman,* 106 A. 2d 50. The trial judge excluded testimony as to an alleged oral agreement varying the terms of a written contract, basing his ruling on the clause of the contract providing "No deviations from plans and specifications will be permitted without an agreement written by the General Contractor." *Id.* at 53. The appellate court held:

> It has been strenuously urged on this appeal that testimony as to the alleged oral agreement was properly excluded because of the provision in the written contract that no deviations from the plans and specifications would be permitted without the written agreement of the general contractor. We must reject that contention. The rule has been accepted by the Courts, both State and Federal, that, even though a written contract stipulates that it may not be varied except by an agreement in writing, nevertheless the parties, by a subsequent oral agreement, may modify it by mutual consent.

*Id.* at 54.

Similarly, here mutual consent was present when Peoples presented an offer in the May 7, 2009, email, and Eric Rothe responded with "Yes, acceptable." JA 652-653.

## IV.    Peoples' Apparent Authority to Bind the Foundation is Clear.

Foundation, for the third time, presents an argument that Peoples cannot bind the Foundation because he did not possess authority, apparent or actual. As

demonstrated below, the facts clearly support Peoples' apparent authority.

Authority conferred upon the agent by the principal can take two forms: actual or

apparent. *Progressive Cas. Ins. Co. v. Ehrhardt,* 69 Md.App. 431, 440 (1986).

> Actual authority is that which is actually granted, and it may be express or implied. Apparent, or, as it is also called, ostensible authority, on the other hand, is that authority which, though not actually granted, the principal knowingly permits the agent to exercise or which himself holds out as possessing.

Id. (quoting 3 Am.Jur.2d Agency, sec. 71, at 575 (1986)).

In other words, one who knowingly permits another to act for him as though

authorized, inducing third persons to rely to their disadvantage on the seeming

authority, is estopped from later asserting the lack of authority of his apparent

agent. *Reserve Insurance Co. v. Duckett,* 240 Md. 591, 600-601 (1965). The

critical factor is reasonable reliance by a third party on the principal's conduct –

the principal becomes responsible for the agent's actions when the principal's

conduct, either affirmative acts or the failure to take corrective steps, has given an

agent apparent authority and thereby induces a third party to rely to his detriment.

*Progressive,* 69 Md.App. at 441.

Here, Norwell relied on HJF's actions in allowing Peoples to negotiate terms

of the Primary License, including sponsored research terms for the budget,

schedule, enrollment criteria, and conduct of the ongoing GP2 clinical trial, and

HJF's failure to take corrective steps, i.e. notify Norwell that Peoples was not

[33]

authorized to negotiate terms of the Primary License.  In fact, as discussed below, HJF supported Peoples' negotiations with Norwell by inviting Peoples to attend meetings and allowing Peoples to send emails regarding the terms of the GP2 license and clinical trial.

The facts here demonstrate that Norwell satisfied any "duty of diligence" to determine whether Peoples was authorized to bind Foundation, and the scope of his authority.  On May 7, 2009, six days prior to execution of the Primary License, Peoples sent an email to Norwell, copied to Scher, stating an enrollment target of 180 patients, a cost-per-patient of $15,000, and an agreement to accept $3M for the entire trial.  JA 652-653.  Scher admittedly saw this email, and didn't respond because there was "no need to" get involved.  JA 540-545 (10/15/13 Transcript, 420:17-425:11).  Even when Rothe responded to Peoples' email with "Yes, acceptable," Scher did not respond.  JA 652-653; 546  (10/15/13 Transcript, 435:7-20).  In fact, during the arbitration hearing, Scher admittedly allowed Peoples to negotiate cost-per-patient and patient enrollment pursuant to an "exception."   JA 532-536 *(*10/15/13 Transcript, 398:10-402:12); 537 (10/15/13 Transcript, 411:1-15).

Foundation's argument that Norwell failed to meet its duty of diligence is nonsensical.  Foundation's cases are distinguishable in that each contains fact patterns where a number of red flags were present that should have lead to further

inquiry regarding whether the apparent agent was authorized to bind the principal and the scope of his authority. In *National Mortgage Warehouse, LLC v. Bankers First Mortgage Co.,* 190 F. Supp. 2d 774, 780 (D. Md. 2002), a national mortgage lender brought an action against a title insurance underwriter for damages it allegedly sustained when the title issuing agent secured fraudulent and fictitious loans. The court determined that a number of red flags warranted further inquiry – the closing protection letter was expired on its face, the letter was not addressed to (and did not mention) the mortgage lender or its assignor, title insurance policies had not been ordered in connection with the loan requests, and at least two of the loan document packages failed to include closing protection letters at all. *Id.* at 781. To the contrary, red flags were **not** present here; and in fact, Foundation encouraged Peoples to negotiate terms of the 2009 Agreement.

Foundation argues that Peoples was Norwell's "lead scientific advisor" for GP2, and was identified as the "Project Director/Principal Investigator." JA 1195-1196, 1233. However, Norwell made it clear during the arbitration hearing that Peoples held these titles for the GP2 clinical trial only – Peoples was never given a formal title with Norwell as a "Norwell advisor" and assisted Norwell merely by providing scientific and clinical knowledge to potential investors, including the ETF. Although multiple attempts were made to execute a formal consulting agreement between Peoples and Norwell, all such attempts failed, including a

rejection of any stock based compensation by Peoples.

Norwell's course of dealing with Foundation lends to its credibility in claiming that it believed Peoples had authority to negotiate on Foundation's behalf. Peoples is the inventor of GP2 and the GP2 clinical trial, for which Peoples was the Primary Investigator at the time, and had run out of funding which stopped the GP2 clinical trial in 2009 prior to Norwell's licensure. Consequently, both Scher and Peoples were working together, hand in hand, frantically trying to find a licensing partner such as Norwell to fund and restart the clinical trial before the trial was permanently shut down by the Foundation. Thus, Peoples had an integral role in negotiating terms of the 2009 Agreement, which role was acknowledged by Foundation. For example, in an email from Mark Scher to Chris Lentz of Norwell, he discusses provisions of the 2009 Agreement, stating, "3.6 – After discussions with Dr. Peoples we believe this language better reflects his discussions with Norwell." JA 727-782 (at 728). Admittedly incorporating Peoples' discussions with Norwell into the 2009 Agreement validates Peoples' authority to negotiate on Foundation's behalf.

Foundation makes the argument that Norwell could not have concluded that Peoples was an employee of the HJF and Army, or that HJF was a government agency on whose behalf Peoples was acting. Norwell has made neither of these arguments. Peoples was an apparent agent of Foundation, not an employee.

[36]

Foundation's mission is to "advance military medicine." Accordingly, it is completely reasonable for Norwell to come to the conclusion that the inventor of GP2, Peoples, who is the Primary Investigator and Foundation representative (as demonstrated by clinical site agreements between Foundation and the clinical sites), would be assisting Foundation in negotiating the terms of the GP2 license and clinical trial. This is especially sound considering the emails, discussed above, where Scher admittedly incorporated Peoples' negotiations with Norwell into the 2009 Agreement, and failed to respond to negotiations between Peoples and Norwell regarding license terms.

Likewise, Foundation's argument that Scher could not bind Foundation is inconsistent. Scher and Peoples negotiated the terms of the 2009 Agreement with Norwell, as demonstrated by countless email exchanges and conferences that occurred after Norwell's initial meeting with Scher and Peoples in January 2008. To now claim that Scher did not have authority to bind Foundation is irreconcilable with Foundation's conduct and facts presented during the arbitration.

The Panel determined that Norwell met its burden in showing that "appearances created by Dr. Scher, the HJF representative in charge of the license negotiations with Norwell, led Norwell to believe that Peoples was HJF's agent. See *JAI Medical Systems Managed Care Organization, Inc. v. Bradford,* 209 Md. App. 68, 57 A.3d 1068 (2012)." JA 496-526, at 517. The District Court agreed.

[37]

Accordingly, the Panel followed well-established Maryland law in finding that Peoples had apparent authority to bind Foundation.  JA 496-526, at 517-518.

## V.      The May 7, 2009, Email Exchange Post-dates the 2009 Agreement and, Thus, is Not Excluded by the Integration Clause.

As discussed above, the Panel determined that even though the parties signed the 2009 Agreement after the effective date of April 24, 2009, their signatures were given retroactive effect.  JA 496-526, at 518.  This determination was made after the Panel heard two weeks of live witness testimony, read sworn statements and deposition transcripts, reviewed over 800 exhibits, and heard oral argument of counsel.  Foundation's arguments regarding what the parties "should have done" to prevent confusion constitutes a speculative leap – the Panel, after hearing all testimony and evidence, is in the best position to determine whether the signatures on the 2009 Agreement were given retroactive effect.  There is a clear "rational connection between the facts found and the choice made" sufficient to uphold the Panel's Award and decision of the District Court to confirm same. *Washington Metropolitan v. Amalgamated Transit Union,* 804 F. Supp. 2d 457, 476 (Dt. Md. 2011) (citing *Dickson v. Secretary of Defense,* 68 F. 3d 1396, 1404 (D.C. 1995)). Accordingly, the May 7, 2009, email exchange constituted a subsequent agreement, made after the April 24, 2009 Agreement, which was not erased by the integration clause contained in section 11.19 of the 2009 Agreement.

[38]

**VI.**     **The Panel did not Award Consequential Damages.**

a.     The Panel Found that Norwell's Loss of Funding Was a "Proximate and Direct" Result of Foundation's Misconduct; Accordingly, They Are Direct and Recoverable.

Consequential damages are defined by Black's Law Dictionary as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from that act. – Also termed indirect damages." Black's Law Dictionary (9th ed. 2009). Direct damages are those which arise naturally or ordinarily from a breach of contract and which can be expected to result from the breach. *TransDulles Ctr., Inc. v. USX Corp.* 976 F. 2d 219, 226 (4th Cir. 1992). Foundation is mistaken in its belief that the Panel awarded consequential damages - a plain reading of the award demonstrates that the Panel awarded Norwell direct damages:

> HJF's wrongful conduct not only made it impossible for Norwell to conclude its dealings with the ETF to obtain funding, it also precluded Norwell from approaching any other investor with respect to GP2… A majority of the Panel finds that Norwell has established that HJF's actions in wrongfully terminating the contracts prevented Norwell from complying with section 4.2 of the License Agreements and was the *proximate and direct cause of damage to Norwell* in the amount of $2,500,000.

JA 496-526, at 511-512 (emphasis added).

b.     Foundation's Argument that ETF Funding Derived From a Collateral Source is Irrelevant; Foundation Had an Obligation to Provide Norwell with Data in Order

[39]

for It to Seek Funding From Any Source.

Foundation makes much ado about the fact that Norwell sought funds from the ETF, a collateral source.  Under the First Amendment to the 2009 Agreement, Norwell was required to "raise at least Three Million Dollars ($3,000,000) in funding (whether by debt, equity, or grant) and provide evidence of same to Foundation."  JA 1003-1008, at 1005, § 4.2.  Although Foundation was under no obligation to assist Norwell with its fund raising efforts, it was required to provide all of the clinical data and FDA correspondence to Norwell that potential investors, including the ETF, required prior to making an investment.  The GP2 data and FDA correspondence provisions were added to the 2009 License and Amendment by Norwell for the explicit, direct purpose to raise money from Texas ETF and other investors and to take over clinical trial development through the IND and direct contact with the FDA.  Norwell and Foundation expected that Norwell would eventually partner with a large pharmaceutical company, who would also expect to control the trial through the IND and possess all GP2 data and FDA correspondence - these are standard investment and partnership requirements for this industry.  Moreover, it is no surprise that Norwell would seek funding from a collateral source, as "grants" as a potential funding option are written into the Agreements.  *Id.*

In February 2012, Norwell lost $2.5M in Texas ETF funding for the clinical

trial as taking control of the trial and operating its own IND, by transfer or other means, was the only material requirement for funding.  Jaye Thompson, an ETF Board member, testified that, if this issue was addressed, Norwell was 'very likely" to have received the $2.5M ETF funding.  JA 627-635 (10/23/13 Transcript, 275:2-283:14).  In fact, during Dr. Thompson's tenure, one out of 75 companies was turned down, and solely based upon a political reason.  JA 626 (10/23/13 Transcript, 76:3-5).  Transfer of the IND (Plan A), or providing all data and FDA correspondence to Norwell so Norwell could receive its own IND (Plan B) was necessary due to the ETF's view that Peoples had an unresolvable conflict.  JA 624-625  (10/23/13 Transcript, 73:18-74:20).  Even HJF's own witness, Mittendorf, pointed out that Peoples "needed to separate himself from the trial because of his other relationships and any potential conflict of interest."  JA 557 (10/16/13 Transcript, 20:18-21).  Without opening its own IND, which requires securing the FDA correspondence and all GP2 clinical data, or by transferring the existing IND, Norwell could not treat its own patients to increase enrollment rates or secure the $2.5M ETF funding.

Section 5.8 of the First Amendment reads:

5.8    Licensee shall provide to Foundation and Foundation shall provide to Licensee, without delay, copies of all FDA submissions and correspondence each has in its possession related to Licensed Products and Licensed

[41]

Processes.

JA 1006, §5.8.

Norwell was led to believe it would be provided all FDA correspondence "without delay" and without necessity of requesting the FDA correspondence. Without the FDA correspondence, Norwell cannot contact the FDA to start on its own clinical trials to help accelerate enrollment, or open its own IND.[3]  Norwell repeatedly requested access to FDA correspondence, and was denied access by both Peoples and HJF in writing.  Silvja Salai (HJF employee) testified that she has all FDA correspondence and sent all of it to HJF Headquarters to multiple individuals, including Ms. Spevak and 3 other people.  JA 1011-1012; (Silvja Salai Depo 35:25-36:23).  Marianne Spevak also testified that HJF had copies of FDA correspondence at its headquarters.  JA 1016 (Marianne Spevak Depo 125:11-13). [HJF HQ had "all" FDA correspondence].  Also, Peoples testified that Spevak would fly to San Antonio to copy FDA correspondence HJF was missing at headquarters.  JA 560-561 (10/17/13, 236:13-237:1).

Scher admittedly did not inquire as to whether HJF had any FDA correspondence in its possession until August 11, 2013, even though this inquiry would have been "as easy as walking down the hall and asking if Spevak had FDA

---

[3] While Norwell's efforts have been halted, both of its competitors have been meeting with the FDA and planning their next clinical trials, as well as raising capital for these subsequent trials.

[42]

correspondence and information concerning the data." JA 550-551 (10/15/13 Transcript, 450:13-451:6). Even after Norwell's numerous requests for access to FDA correspondence, Scher did not ask anybody who worked for HJF whether they had any FDA correspondence, case reporting forms, or clinical trial data. JA 552-553 (10/15/13 Transcript, 452:16-453:4).

Section 5.6 of the First Amendment reads as follows:

5.6 Foundation shall make available to the Licensee all preclinical, manufacturing, and clinical data and information in its possession related to the Patent Rights licensed hereunder.

JA 1006, at § 5.6.

HJF and Peoples agreed that all data in their possession would be provided to Norwell.[4] Without the clinical data, Norwell cannot assess the status of the trial, cannot approach investors and large pharmaceutical companies, cannot manage the conduct of the clinical trial, could not secure the $2.5M ETF funding, and cannot approach the FDA.

On February 1, 2010, Mark Scher confirmed that HJF was in possession of

---

[4] The promised data includes access to relevant databases, including case report forms, summary and individual patient data of previous human experience, investigator brochures, CMC information, protocol amendments, information amendments, safety reports, reporting to the FDA, safety reviews, summary of any adverse events, endpoint reports or reporting to the FDA, full list of investigators and curriculum vitas, investigator reports, disqualifications of a clinical investigator with reasons, record keeping policy/process, SOPs, lists of samples retained, FDA or IRB inspections with reports, copies of all active contracts, up-to-date label for drug product, disposition of drug reports/process/policy, and drug product export processes.

GP2 data and the IND via correspondence to Norwell stating, "The data will be jointly owned but the trial-specific documents, databases, and IND remain in the possession of the Foundation/Dr. Peoples." JA 784-786. Furthermore, Laura Ferrise testified that she was at all times in possession on her HJF owned laptop of all clinical data sent to her from all the clinical sites. JA 932-937. She testified at no time did anyone from HJF ask her to send them any or all of the GP2 clinical data. *Id.* When questioned if asked at any time if she would send all the clinical data to HJF home office, she testified she would do so even if Peoples had asked her not to do so. *Id.*

Similarly, Balan Ponniah, a HJF employee, was at all times in possession of GP2 patient sample data on his computer from samples sent to him from all of the clinical sites, analyzed in his lab with his HJF employed staff, and stored in a database or spreadsheet. JA 112-946 (Ponniah Depo, 112:11-118:8). Furthermore, the Panel determined that Foundation wrongfully terminated Norwell's license rights on March 16, 2012 – more than a month before the ETF's April 26, 2012, communication regarding Norwell's ETF application, and the April 24, 2012 deadline in section 4.2. Foundation knew that Norwell would not be able to secure ETF funding or fulfill section 4.2 if Foundation breached sections 5.6 and 5.8, blocking both Plan A and Plan B, and if Foundation terminated the license. The Panel determined that Foundation breached the 2009 Agreement by (1) failing

[44]

to give Norwell the FDA correspondence and data, and (2) wrongfully terminating

the 2009 Agreement:

> To add to Norwell's difficulties, HJF's failure to provide the data and correspondence that Norwell requested was coupled with HJF's wrongful termination of Norwell's 2009 license rights on March 16, 2012, which occurred more than a month before receipt of Prochnow's communication on April 26, 2012. … With respect to the funding requirements contained in section 4.2 of both the 2009 and 2010 License Agreements, ***termination of the licenses by HJF – which left Norwell with no rights whatsoever to GP2 – constituted a total and fundamental breach*** that made it impossible for Norwell to secure the $2,500,000 of ETF funding or to otherwise fulfill its obligations under section 4.2.

JA 496-526, at 511 (emphasis added).

Accordingly, it was these two breaches by Foundation that excused

Norwell's performance under section 4.2.  Once performance is excused, causation

based on the timing of an excused contractual requirement (i.e. that Norwell's ETF

application was put back on track two days after Norwell was required to raise

$3,000,000 pursuant to section 4.2) is irrelevant.  Foundation's argument is

confusing misdirection, intended to misguide this Court from a true reading of the

Panel's award and the true timeline of events.

Pursuant to the License, HJF was under an obligation to make this

information accessible to Norwell and knowingly failed to do so.  Foundation

falsely claims that it withheld GP2 data and FDA correspondence in 2012 in

response to Norwell's non-payment of the clinical trial support payments.  This is

[45]

simply not true.  Foundation had not been providing GP2 data and FDA correspondence to Norwell in 2011, despite written requests by Norwell, while Norwell was making all clinical trial support payments in 2011.  Norwell finally refused to pay the clinical trial support payments in 2012 because Foundation was withholding GP2 data and FDA correspondence and had refused to cure this material breach throughout 2011.

The Award places Norwell in the position it would have occupied had Foundation not wrongfully withheld GP2 data and FDA correspondence, and had Foundation not wrongfully terminated the Agreements.  The Award permits Norwell to recover the amount it paid to Foundation under the License, as allowed under § 11.3 of the 2009 Agreement, which states, "THE FOUNDATION'S AGGREGATE LIABILITY FOR ALL DAMAGES OF ANY KIND RELATING TO THIS AGREEMENT OR ITS SUBJECT MATTER SHALL NOT EXCEED THE AMOUNT PAID BY LICENSEE TO THE FOUNDATION UNDER THIS AGREEMENT."  JA 1038.  Foundation's claim that awarding Norwell damages within the scope of the Limitation of Liability Provision is somehow "contradictory and irrational" is not grounds to vacate the Award.

Likewise, Foundation's arguments that the damages awarded are consequential because Foundation was not a party to the ETF transaction, was under no obligation to assist Norwell with its ETF fundraising efforts, and the

[46]

Agreements do not mention the ETF funding, are irrelevant. Although the Foundation had no obligation to assist Norwell with its fundraising efforts, it was under the obligation to comply with the Agreements and provide Norwell with the very data that investors require prior to making an investment. Foundation cannot contract with Norwell for Norwell to raise at least $3,000,000 in funding (whether by debt, equity, or grant), and then block Norwell from raising such funding by breaching written provisions in the License and Amendments. JA 1005, §4.2. Likewise, at the time of contracting, it was clear that Norwell would seek funding from an outside source as Norwell had no cash or funding commitments at the time of contracting. *Id.*

Foundation cites *Hoang v. Hewitt Ave. Assocs.,* 936 A. 2d 915, 935 (Md. Ct. Spec. App. 2007) for the proposition that loss of "other contracts collateral to the one broken, contracts to which the defendant was not himself a party" result in consequential damages. Foundation's reliance is misplaced. *Hoang* dealt with the context of a contract action by a buyer against a seller for failure to convey real estate and the lost profits the buyer anticipated earning upon resale of the property to another. *Id.* Unlike the situation present here, where the 2009 Agreement (through the First Amendment) requires Norwell to obtain funding, in *Hoang*, the original contract did not obligate the buyer to resell the property to another. Here, we are dealing with loss of funding required under the 2009 Agreement, not lost

profits pursuant to a collateral contract. Likewise, Foundation cites no authority

supporting its argument that because Norwell's ETF transaction was with a third

party, it is collateral and contingent, resulting in consequential damages.

**VII.** **The Panel Found that Norwell's Loss of Funding Was Proximately Caused by Foundation; Accordingly the Causation Requirement Has Been Met.**

In contesting whether Foundation caused Norwell's damages, Foundation

misguides the court by focusing on its wrongful termination of the 2009

Agreement, rather than focusing on its breaches of the Agreement – failure to

provide Norwell with GP2 data and FDA correspondence. Section 4.2 of the 2009

License Agreement requires Norwell to raise $3,000,000 within 36 months. JA

1005. To meet the bulk of its contractual obligation under section 4.2, Norwell

applied for a $2.5 million grant from the Texas Emerging Technology Fund (ETF).

As dictated by the Panel, "Norwell's uncontradicted evidence showed that once

approved by the Advisory Committee, subsequent approval by the Governor's

office is forthcoming almost without exception." JA 496-526, at 508.

Unfortunately, a new Advisory Committee was appointed which re-reviewed

Norwell's application, and found one issue which could not be resolved without

Norwell obtaining the IND, through transfer or otherwise – Peoples had a conflict

of interest due to his promotional and financial involvement with several

[48]

competing peptides licensed to competing companies. JA 496-526, at 509. Since Peoples refused to transfer the IND ("Plan A"), unless Norwell paid Peoples $500,000 in cash, Norwell needed to follow "Plan B," and seek its own IND from the FDA by approaching the FDA with all FDA correspondence and data related to GP2. Accordingly, the Panel found "that HJF materially breached the License Agreement by its failure to provide Norwell with all of the GP2 data and FDA correspondence in its possession." JA 496-526, at 511. Foundation then further damaged Norwell by proceeding to wrongfully terminate the License, which further impeded Norwell's ability to raise capital. Foundation argues that ETF funds were never relied upon by Norwell to meet its §4.2 obligations. This statement is simply not true. Norwell specifically sought ETF funds to meet its §4.2 obligations and had substantial meetings and due diligence with ETF from 2009 - 2012. Foundation also claims that ETF was not aware of the terminations. This is a red-herring – ETF was aware that Foundation was withholding GP2 data and FDA correspondence, preventing Norwell from pursing "Plan B," discussed above. Furthermore, the Foundation is misleading the court with regards to the timing of events. The Foundation blocked ETF funding in January through March 2012, before the Foundation wrongfully terminated the License in April 2012. Foundation further argues that there is a lack of causation because Norwell could not have received ETF funding prior to the April 24, 2012, deadline for fulfilling §

4.2 of the 2009 Agreement.  Foundation is confused.  Norwell's ETF application

was "put back on track" at the end of 2011 to early 2012.  ETF demanded that

Norwell become independent from Peoples many times during February through

April 2012.  Additionally, Norwell made Foundation and Peoples aware of the

ETF demand through correspondence, specifically the correspondence dated

February 29, 2012, bates numbered NOR000062, Third Paragraph and Appendix

A:

> Norwell needs immediate transfer of the IND and associated data to
> continue commercialization of GP2.  The Company was approved for
> $2.5 million in ETF funding, but in final diligence the ETF has raised
> the issue of Dr. Peoples' potential conflict with Galena.  The
> Company needs to demonstrate to ETF that it is in control of the trial
> and data.

JA 788-808.

Accordingly, Foundation's argument is moot.

## VIII.    The Panel's Award Adheres to Fundamental Principles of Maryland Damages Law, is Fair, Proportionate, and Supports Continuation of a Promising Clinical Trial for A Breast Cancer Vaccine.

### a.    The Standard for Manifest Disregard of the Law is Extremely High.

The Fourth Circuit has noted two common law grounds for vacation: (1)

"where an award fails to draw its essence from the contract;" and (2) where "the

award evidences a manifest disregard of the law."  *Three S Delaware, Inc. v.*

*DataQuick Information Systems, Inc.,* 492 F. 3d 520, 527 (4th Cir. 2007) (citing

[50]

*Patten v. Signator Ins. Agency, Inc.*, 441 F. 3d 230, 234 (4th Cir. 2006)) (internal

quotation marks omitted).  Recent Supreme Court precedent has "inject[ed]

uncertainty into the status of manifest disregard as [an independent] basis for

vacatur." *Wachovia Securities, LLC v. Brand*, 671 F.3d 472, 480–83 (4th Cir. 2012)

(discussing the Supreme Court's decisions in *Hall St. Assocs., L.L.C. v. Mattel,*

*Inc.*, 552 U.S. 576 (2008), and *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130

S. Ct. 1758 (U.S. 2010)). The Fourth Circuit has interpreted the Supreme Court's

recent decisions "to mean that manifest disregard continues to exist either 'as an

independent ground for review or as a judicial gloss on the enumerated grounds for

vacatur set forth in 9 U.S.C. § 10,'" but it has not resolved which of the two

approaches is correct. *Id.* at 483 (quoting *Stolt-Nielsen, S.A. v. Animal Feeds*

*International Corp.*, 130 S. Ct. 1758, 1768 n.3 (2010)). The Fourth Circuit has

stated, however, that "[w]ether manifest disregard is a 'judicial gloss' or an

independent ground for vacatur, it is not an invitation to review the merits of the

underlying arbitration." *Id.* (citing *United Paperworkers Int'l Union v. Misco, Inc.*,

484 U.S. 29, 38 (1987)). Accordingly, the Court endorsed continued application of

a "two-part test which has for decades guaranteed that review for manifest

disregard not grow into the kind of probing merits review that would undermine

the efficiency of arbitration." *Id.* Under that test, in order to vacate an award for

manifest disregard, the moving party must show that: (1) "'the applicable legal

[51]

principle is clearly defined and not subject to reasonable debate'"; and (2) "'the arbitrator[] refused to heed that legal principle.'" *Id.* (quoting *Long John Silver's Restaurants, Inc. v. Cole*, 514 F.3d 345, 349 (4th Cir. 2008)). As demonstrated below, Foundation has failed to satisfy its heavy burden.

Notably, the standard for manifest disregard of the law is extremely high. An arbitrator's award is entitled to a special degree of deference on judicial review. *Upshur Coals Corp. v United Mine Workers, Dist. 31,* 933 F. 2d 225, 228 (4th Cir. 1991). Not only is an arbitrator's fact finding and contract interpretation accorded great deference, but its interpretation of the law is accorded great deference as well. *Id.* at 229. "An arbitration award is enforceable '*even if the award resulted from a misinterpretation of the law, faulty legal reasoning or erroneous legal conclusion,*' and may only be reversed 'when arbitrators understand and correctly state the law, but proceed to disregard the same.'" *Id.* (emphasis added) (citations omitted). As demonstrated below, Foundation's arguments that the Panel misinterpreted the law, used faulty legal reasoning, or came to an erroneous legal conclusion, are not grounds to vacate the award.

**b.** The Panel did not Disregard Law by Awarding Norwell Damages and Specific Performance as Remedies for Breach of Contract.

      **i.** Under Maryland law, an Award of Specific Performance and Damages is Not Prohibited.

Specific performance is considered an extraordinary equitable remedy which may be granted where more traditional remedies, such as damages, are either unavailable or inadequate. *Archway Motors, Inc. v. Herman*, 37 Md. App. 674, 681 (1977). An award of specific performance does not prohibit an award of damages. *See Id.* at 687-688. It has long been recognized in Maryland and generally throughout the country, that, in decreeing specific performance, a court may also award ancillary monetary damages to compensate for losses arising from a breach. *Id.* It is also clear that such relief may be granted under a general prayer. *Id.* at 688; *Miller v. Talbott,* 239 Md. 382 (1965). Foundation confuses Maryland's election of remedies doctrine with actual law, which permits recovery of monetary damages in addition to specific performance. Specifically, an election of remedies is not necessary due to the fact that Maryland law permits recovery of damages in addition to specific performance. Therefore, the Panel did not disregard law or exceed its authority in awarding Norwell specific performance of the 2009 Agreement and monetary damages.

Courts often find specific performance and monetary damages appropriate when the subject of a breached contract is unique, such as a parcel of land. *See, Archway Motors, Inc.; See, Walzl v. King*, 113 Md. 550 (1910). These remedies are particularly recognized as appropriate because of the presumed uniqueness of land itself, no parcel being exactly like another. *Archway Motors, Inc.*, 37 Md.

App. at 681.  Foundation conceded to the District Court and throughout the arbitration hearing the uniqueness of GP2, by identifying GP2 as "highly promising," "potentially life-saving," and a drug which "could save or extend lives."  JA 7.  Under the unique set of circumstances here – GP2 is a unique drug, unlike any other drug – specific performance and monetary damages are clearly warranted.  The District Court agreed, "There's also a contention that the damages and specific performance award should be vacated.  And the foundation argues that the award is a manifest disregard of Maryland law because the two remedies are mutually exclusive.  That I do not agree."  JA 1964 (Transcript, 61:5-9).

Foundation's argument centers around whether the monetary damages can be considered "ancillary" as stated by the District Court.  Foundation's cited cases are distinguishable – each discusses the situation where a plaintiff brings a cause of action for specific performance, and is awarded specific performance and ancillary monetary damages.  *See, e.g., Bernardini v. Stefanowicz,* 29 Md. App. 508 (Md. 1976) (Court upheld an award of compensation ancillary to specific performance).  Here, Norwell was awarded monetary damages pursuant to its breach of contract cause of action, and specific performance.  Furthermore, and as discussed above, the monetary damages awarded in addition to specific performance were appropriate, regardless of the terminology used by the District Court or Foundation.

Accordingly, and contrary to Foundation's assertion, the Panel followed Maryland's clear legal principal that specific performance and monetary damages may be awarded.

**ii.** <u>The Panel Did Not Impose New Contractual Requirements That Fail to Draw their Essence from the Agreements.</u>

Foundation argues that the Panel improperly required Foundation to exclusively license GP2 to Norwell for an additional 24 months, improperly eliminated Norwell's requirement to pay clinical trial financial support payments under section 3.6 of the 2009 Agreement, improperly postponed Norwell's obligations to make royalty payments, maintenance royalty payments, and patent expenses payments for 24 months, improperly relieved Norwell of its obligations to pay any currently unpaid delay fees to Foundation resulting from its failure to pay amounts owed under the 2009 Agreement, and improperly allowed Norwell to pursue the GP2 clinical trial on an independent basis.

The Panel permitted Norwell to postpone its payments under the 2009 Agreement, and would be the licensee of GP2, for 24 months due to the suspension of the 2009 Agreement during the approximately 24 months that the arbitration has been pending. JA 496-526, at 520. Foundation has cited no authority disallowing this result.

The Panel properly found that it would be unfair to require Norwell to

continue to pay Foundation under section 3.6 of the 2009 Agreement given the breach of the May 7, 2009 agreement by the Foundation: "Since we have determined that the enrollment requirements of the May 7, 2009 agreement have not been met, and since HJF has not notified the Panel that it would do so after receiving the objection of Norwell, it would be unfair to require Norwell to continue to pay HJF under the License Agreement to fund the GP2 clinical trial for further enrollment which may now be undertaken by Norwell. Therefore, Norwell will be relieved of its Clinical Trial Financial Support obligation under section 3.6 of the License Agreement…" JA 496-526, at 520.

Similarly, the Panel did not re-write the 2009 Agreement to dispose of Norwell's clinical trial financial support obligation. Instead, the Panel determined that Foundation's breach of contract excused Norwell from performance under the 2009 Agreement, including its obligation to pay the installment due for its clinical trial financial support obligation. JA 496-526, at 511.

Unfortunately, Foundation's arguments are crowded with misrepresentations of the Panel's award, Maryland legal authority, and the facts. Foundation had the opportunity to present its arguments to the Panel, and after a complete examination of evidence, the Panel entered a well-reasoned award. Likewise, Foundation had the opportunity to present its argument to the District Court, and after doing so, the District Court ruled in favor of Norwell. Foundation's contentions that the Panel

[56]

re-wrote the 2009 Agreement are merely last-ditch efforts to contest an award it simply does not like.

## IX.    A Mutual, Final, and Definite Award was Rendered.

No evidence in the record demonstrates that this Court should vacate the award because it was "so imperfectly executed that a mutual, final, and definitive award… was not made." *See* 9 U.S.C. sec. 10(a)(4). An award should be vacated as not final or definitive "only when the arbitrator either failed to resolve an issue presented to him or issued an award that was so unclear and ambiguous that the reviewing court could not engage in meaningful review." *Int'l Longshoremen's Ass'n, Local No. 1624 v. Hampton Rds. Shipping,* No. 94-1838, 1995 WL 19321 at •8 (4th Cir. Jan 19, 1995). There is no evidence that the Panel failed to consider an issue put before it, nor is the award unclear or ambiguous. Indeed, the Panel's award "could hardly be more final and definite." *See Remmey v. PaineWebber, Inc.,* 32 F.3d 143, 150 (4th Cir. 1994).

Foundation mistakenly assumes that Norwell may only continue the existing GP2 phase II clinical trial by obtaining the current investigator sponsored IND from Peoples. Norwell presented a second option during the arbitration hearing and discovery – it may pursue its own IND by approaching the FDA with the current GP2 data and FDA correspondence, and thus continue enrollment with its own patients, independent of Peoples and the Foundation. The Panel ruled that

[57]

Norwell's pursuit of its own IND is a definite possibility, pursuant to expert testimony.

Foundation misleads this court by distorting the Panel's ruling and intent. The Panel did not insist that new patients should be enrolled by the Foundation because the Foundation was not willing to comply with the May 7, 2009 email agreement and was mixing in placebos from another drug arm of the trial. Furthermore, because Norwell was willing to enroll its own patients, the Panel fully empowered Norwell to be able to start enrolling its own patients and required the Foundation to comply with all license provisions to end the Foundation's blockage of Norwell. The Panel in no way suggested that there would be any disputes between Norwell and the Foundation with regards to 1) the Foundation obligation to complete the treatment and follow-up of the patients that the Foundation had already enrolled or 2) any future patients that Norwell would enroll. Instead, the Panel chose a path forward that minimizes interactions between Norwell and Foundation and allows for the commercialization of GP2 to continue, with a ruling that serves the public's and breast cancer patient's interest to see GP2 further developed.

Foundation erroneously claims that there is a crisis related to the future of the clinical trial and, more specifically, which party is required to pay for the continued treatment of those patients already enrolled to date by the Foundation.

[58]

Norwell has paid the Foundation $2.1 million, the majority of which includes payments for the full treatment of patients enrolled, not just the enrollment of each patient. In addition, the Panel was fully aware in their ruling based on extensive testimony and review of critical agreements such as provision 3.6 of the 2009 Agreement and the underlying clinical site agreements between the Foundation and the clinical sites, that the Foundation, and not Norwell, is required to complete the treatment and follow up of patients after patients were enrolled by the Foundation, pursuant to the GP2 clinical trial protocol. During the arbitration, Foundation never objected to such requirement. The Panel's award states that Foundation will continue its obligations in the 2009 Agreement (JA 523 at #2) and thus complete treatment and follow up with patients already enrolled at no additional cost to Norwell. The Panel also specifically states that Norwell will not need to make any further Clinical Trial Support Payments (JA 524 at #8) and that all of its payment obligations are satisfied. It can not be any clearer that Foundation is responsible for all expenses for those patients that it has enrolled and that Norwell's financial obligation for these patients has been met.

From inception, Norwell and Foundation contemplated that the 2009 Agreement included sponsored research and that once a patient was enrolled and fully paid for by Norwell through provision 3.6, Foundation was responsible for all treatment and costs going forward, covering "past, ongoing, and future expenses",

expenses that had to be incurred by the Foundation, the manager and contractor of the clinical trial network. It is also clear from the clinical site agreements between the clinical sites and the Foundation and the testimony during the arbitration hearing that the majority of Norwell's $2.1 million paid to the Foundation is more than sufficient to cover the full treatment costs of all patients recruited to date, that Foundation is responsible for treating these patients, and that there is no harm to cancer patients in the trial. JA 1523-1548; 1550-1571; 1573-1595; 1595-1618; 1620-1658; 1660-1708; 1710-1736; 1738-1759. From these agreements, one can see that the Foundation agrees to pay these clinical sites an average of $3,500 per patient for the full treatment of the enrolled patient until the trial ends, including boosters. *Id.* Thus, Norwell already fully paid for the treatment of the patients enrolled to date, as $3,500 times 150-180 patients enrolled in the GP2 arm equals $525,000 to $630,000, substantially less than the $2.1 million Norwell has paid Foundation to date. This calculation was fully understood by the Panel based on extensive testimony and evidence regarding cost per patient and patient enrollment figures. In fact, if Norwell had not been the licensee or if there had been no licensee, as was the case before the 2009 Agreement, Foundation is solely responsible for everything related to patient treatment and patient costs based on the Foundation's agreements with the clinical sites and the clinical trial protocol, as was the case before Norwell entered into the 2009 Agreement. Norwell's role as

sponsor of the trial was to pay cash in exchange for data and FDA correspondence, so that Norwell could use that information to further develop GP2. The Panel clearly ruled that Norwell no longer has to pay cash for the clinical trial but is entitled to all of the data and FDA correspondence for all patients in the GP2 trial. JA 496-526. Accordingly, Foundation's questions have been answered – Foundation is required to follow through with the currently enrolled patients while Norwell, at its own option and costs, may enroll its own patients and combine both groups of patients into one data set for the entire trial.

In addition, there is no harm to cancer patients in general, as the Panel has provided a path forward for the commercialization of GP2, with Norwell taking the lead, and the Foundation supporting Norwell as the lead, which was always the intent of the Agreements. Thus, Norwell can now fulfill its 2009 License obligation to commercialize GP2 without being blocked by the Foundation and there is no unresolved issue or ambiguity that should lead to further disputes. Finally, Foundation continues to conduct clinical trials and/or manage license agreements for Antigen Express and Galena, Norwell's competitors. Peoples has left the military yet the Foundation's obligations with these companies, with these ongoing clinical trials and clinical sites, and with the treatment of patients enrolled by the Foundation's clinical trial network continue. There is no reason that the Foundation cannot start complying with all 2009 Agreement requirements

[61]

immediately and complete the treatment of those patients that it enrolled in the

GP2 trial, just like the Foundation does in their sponsored research clinical trials

with Norwell's competitors.

## X.      ATTORNEYS' FEES AND COSTS.

Norwell respectfully requests an award of fees and costs pursuant to Fed. R.

App. Proc. 38.  Foundation's appeal is frivolous, and it is evident that Foundation

has been harassing Norwell and abusing the courts, warranting an award of fees

and costs.  *Dyntel Corp. v. Ebner,* 120 F. 3d 488 (4th Cir. 1997) (Sanctions were

awarded for a lawsuit and appeal motivated by malice.).  This frivolous appeal

further extends Foundation's non-compliance with the Panel's time sensitive

rulings that would have started on the effective date of March 25, 2014, further

harming Norwell and reducing the effective time of the 2 year reprieve granted by

the Panel.  To date, Norwell still remains blocked from pursuing its own IND and

resuming development of GP2 and can only do so after Foundation complies with

the Panel's order in its entirety, such as payment of damages with interest and

immediate compliance with all GP2 data, FDA correspondence, patent, and

publication provisions of the License.

Foundation has raised the arguments presented in this appeal three times: at

arbitration, via motion to vacate to the district court, and now on appeal.  This

appeal is particularly unjustified given the strong language of the District Court:

"In reviewing this award as a whole, if I were to have the power of a Fourth Circuit judge… I would not be inclined to disturb this award even if I had that broad authority..."  JA 1955 (Transcript, 52:10-14).  Judge Titus went on to state, "I conclude that even if I had the authority to probe into this matter as deep as the Fourth Circuit could do in reviewing one of my rulings, that this was a ruling that is consistent with Maryland law and that there is no legal infirmity in the panel's reliance upon this as being an effective agreement such that would justify vacating the award."  JA 1959 (Transcript 56:13-19).  Likewise, Judge Titus reiterated, "But, [The Award] certainly, as I said before, would to me pass muster if I had the authority of the Fourth Circuit to review it."  JA 1962 (Transcript 59:3-6).  Accordingly, Norwell respectfully requests an award of fees and costs associated with this frivolous appeal.

///

///

///

///

///

///

///

///

## XI.     <u>CONCLUSION.</u>

For the above reasons, Norwell respectfully requests that this Court deny

Foundation's requested relief and affirm the Order of the District Court and

Panel's Award.

*Respectfully Submitted*:

September 8, 2014                         **HINES CARDER**
                                         By:     <u>/s/ Marc S. Hines</u>
                                         Marc S. Hines (*Admitted Pro Hac Vice*)
                                         3090 Bristol Street, Suite 300
                                         Costa Mesa, California 92626
                                         Phone: (714) 513-1122
                                         Fax: (714) 242-9529
                                                        mhines@hinescarder.com
                                                        *Attorneys for Defendant,*
                                                        *NORWELL, INC.*

## <u>REQUEST FOR ORAL ARGUMENT</u>

Norwell respectfully requests that this Court hear oral argument on the issues presented by this appeal.

September 8, 2014   *Respectfully Submitted*:

        **HINES CARDER**

        By: <u>/s/ Marc S. Hines</u>
           Marc S. Hines (*Admitted Pro Hac Vice*)
           3090 Bristol Street, Suite 300
           Costa Mesa, California 92626
           Phone: (714) 513-1122
           Fax: (714) 242-9529
           Email: mhines@hinescarder.com

           *Attorneys for Defendant,*
           *NORWELL, INC.*

[65]

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 12,187 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 pt. Times New Roman font.

/s/ Marc S. Hines
Marc S. Hines

# CERTIFICATE OF SERVICE

I certify that on September 8, 2014, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:


/s/Rachael M. Messaros                    September 8, 2014
Signature                                 Date

[67]